UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

SUNNY BUNTIN,                          )
                                       )
              Plaintiff,               )
                                       )        Cause No. 1:10-cv-0359-SEB-DML
       vs.                             )
                                       )
THE CITY OF INDIANAPOLIS,              )
                                       )
              Defendant.               )


**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

       This cause is before the Court on Defendant's Motion for Summary Judgment

[Docket No. 38], filed on May 23, 2011, pursuant to Rule 56 of the Federal Rules of Civil

Procedure and Local Rule 56.1.  Plaintiff, Sunny Buntin,[1] brings her claim against her

former employer, the City of Indianapolis (the "City"), for its allegedly discriminatory

actions toward her based on her race and gender (African-American), in violation of Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*  For the

reasons detailed in this entry, we GRANT Defendant's Motion for Summary Judgment.

**<u>Factual Background</u>[2]**

---

       [1]Plaintiff refers to herself as Sunny Walton in her response brief.  However, because there
has been no request to alter Plaintiff's name in the caption of this case, we will continue to refer
to her as Buntin for present purposes.

       [2]Local Rule 56.1(e) states as follows:

       For purposes of deciding the motion for summary judgment, the court will assume
       that the facts as claimed and supported by admissible evidence by the moving

1

Buntin submitted an application to become a police officer with the Indianapolis Metropolitan Police Department ("IMPD") in April 2008.  IMPD accepted Buntin's application, and she was admitted as a probationary officer to the "Fourth Recruit Class" along with approximately forty-seven other recruits.

Pursuant to Indiana law, each of the designated probationary officers in the new class of recruits, including Buntin, underwent law enforcement training at IMPD's Training Academy.  Generally, this training extends over approximately one year.  The first phase of the training consists of classroom and on-site training.  The second phase is called "Field Training," during which each probationary officer is assigned to a field

---

party are admitted to exist without controversy, except to the extent that such facts: are specifically controverted in the opposing party's "Statement of Material Facts in Dispute" by admissible evidence; are shown not to be supported by admissible evidence; or, alone, or in conjunction with other admissible evidence, allow reasonable inferences to be drawn in the opposing party's favor which preclude summary judgment.  The court will also assume for purposes of deciding the motion that any facts asserted by the opposing party are true to the extent they are supported by admissible evidence.  The parties may stipulate to facts in the summary judgment process, and may state that their stipulations are entered only for the purpose of the motion for summary judgment and are not intended to be otherwise binding.  The court has no independent duty to search and consider any part of the record not specifically cited in the manner described in sections (a) and (b) above.

While we accept the supported facts offered in Plaintiff's responsive briefing as true, these facts are few and fail to address many of the facts recited by Defendant.  Moreover, many of the facts Plaintiff purportedly disputes are immaterial to considering the motion and/or lack appropriate citations to the record.  For instance, Plaintiff's citations to entire depositions or "excerpts from text messages" are entirely insufficient.  *See, e.g.*, *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004) (affirming a district court's decision to strike a response to summary judgment motion and noting that "[c]itations to an entire transcript of a deposition or to a lengthy exhibit are not specific and are, accordingly, inappropriate").  Thus, the Court shall consider the unaddressed facts as undisputed for purposes of this motion, as provided for by our local rules and by Federal Rule of Civil Procedure 56(e)(2).

training officer ("FTO"), who guides and evaluates the probationary officer's performance and progress. Only those probationary officers who successfully complete both phases of the training may graduate and become a full members of IMPD with full police powers.

Buntin began her initial six month training phase on or about April 28, 2008. During her classroom training, Buntin received instruction, *inter alia*, on the proper manner to communicate over the IMPD radio system and how to respond to stressful or dangerous situations.

After successfully completing the first phase of training, Buntin began the second, Field Training, phase of the program. Field Training is meant to allow probationary officers to practice the lessons learned during the initial classroom portion of the training. As noted above, part of the Field Training includes probationary officers being assigned to a primary and other assisting FTOs who work with the probationary officer over the course of rotations. During this phase, the FTOs create Daily Observation Reports ("DORs") to evaluate the probationary officers' performance. The DORs contain specific areas for which the probationary officers' performance is scored on a scale of one through seven—a score of one signifying "not acceptable," a score of four signifying "minimal accepted," and a score of seven signifying "superior." A score of three or lower is considered unacceptable and failing. Over the course of four rotations, as the weeks pass, probationary officers are expected to handle increasing levels of law enforcement duties and receive higher scores in their DORs. For instance, scores on DORs in a probationary

officer's first rotation are expected to be low, and non-passing scores are common. Scores in the second and third rotations, however, are expected to improve to a level at or exceeding acceptable standards. At the conclusion of each rotation, the FTO's supervisor completes a Rotation Summary Report.

During the fourth rotation of Field Training, probationary officers work again with the primary FTO to whom they were assigned for their initial rotation. This rotation is four weeks long and consists of two phases. First, the primary FTO is to evaluate the probationary officer's improvement since her initial rotation. By this time, the probationary officer is expected to handle 85-100% of the law enforcement duties with "little or no guidance." Def.'s Ex. D at 29. Additionally, the probationary officer must "earn satisfactory scores in all critical areas for at least a week" prior to being recommended for the second phase, or the "Plain Clothes Phase," of the rotation. Def.'s Ex. D at 23. If the probationary officer does not enter the Plain Clothes Phase of the rotation due to having failed over the course of a week's time to achieve acceptable daily reports, the probationary officer is designated "Not Responding to Training" ("NRT") and is required to undergo remedial training. During remedial training, a probationary officer "will . . . have two weeks to markedly improve [her] performance in the designated area or areas or face separation from the program to include possible termination." Def.'s Ex. D at 30.

Buntin's primary FTO and the officer with whom she trained during her initial rotation was Officer Cathy Faulk. Buntin's FTOs in subsequent training rotations

included Officers Angelina Poe, Charles King, David Peace, Michael Burgess, and Rick Jones. Buntin testified that Officers Poe, King, and Peace evaluated her performance fairly. Buntin Dep. at 62. She testified that she did not have enough time with Officer Jones to allow Buntin to assess whether his evaluations of her were fair. *Id.* at 117. All of these officers performed evaluations of Buntin's performance in the DORs submitted to the record by both parties. *See* Def.'s Ex. 10; Pl.'s Ex. 2. Buntin's DOR scores varied, but the vast majority of those scores were between levels two and four in all areas of evaluation. Def.'s Ex. I. Although Buntin's scores appear to have improved over time and she earned several scores of five in late December 2008 and early January 2009, Buntin also received scores of two or three, *i.e.*, an unacceptable or failing score, in several areas during the final weeks of her training. *Id.* Moreover, Buntin never earned above a level three in all critical areas during a one-week period, as required to move on to the Plain Clothes Phase of training. *See id.*

On or about January 23, 2009, Officer Faulk and Sergeant Linda Jackson determined that Buntin should not proceed to the Plain Clothes Phase of her fourth rotation. In the "Comments" section of Officer Faulk's recommendation, she wrote:

> PO Buntin struggles daily with orientation. She has difficulty reading a map and often does not see the visual cues available that she is arriving or at least in the area of her assigned run. PO Buntin lacks confidence in decision making, she would rather not make a decision at all than make the wrong one. PO Buntin needs reassurance constantly that she is on the right course. PO is not assertive and does not seek out self intiated [sic] activity. PO notes traffic violations but does not stop cars.

Def.'s Ex. L.

Buntin was informed of the decision and about the NRT Plan on February 2, 2009. Of Buntin's class of recruits, only she and three other probationary officers were designated NRT. All four received some sort of remedial training; however, only one of these officers responded to the remedial training and completed Field Training. Buntin was assigned to remedial training with Officers Burgess and Peace. Buntin received three evaluations during her remedial training in which she was assigned scores of two, three, and four. Buntin did not complete the remedial training because she became ill and was eventually terminated.[3]

Buntin has alleged that Officer Faulk created a "racially charged environment" by "referring to Hispanics as "license never received," implying that all Hispanics have never qualified for a license, and African-Americans as "suspended prior," implying that all African-Americans have had their licenses suspended. Compl. ¶ 11. She alleged that

---

[3]The facts surrounding the time immediately preceding Buntin's termination are highly disputed. Defendant asserts that after taking one authorized day off for illness during her remedial training, Buntin remained off work without further authorization for eight additional consecutive days, in violation of several IMPD policies. Eventually, according to Defendant, IMPD officers went looking for Buntin out of concern for her safety, after which Buntin faxed a medical statement to IMPD in which Buntin's physician asked that she be granted three weeks off-duty due to post traumatic stress disorder. Buntin disputes this version of the facts and maintains that her phone records reveal that she called both of her supervising officers and IMPD's "sick line" on each day of her illness. She maintains that she was on an "approved leave of absence" at the time she was terminated. The parties also dispute the admissibility of Buntin's phone records because they were never produced during discovery due to an apparent mistake on the part of Buntin's counsel. Fortunately, this case can be decided without need of resolving the conflicting facts regarding Buntin's absences in her final weeks of employment as a probationary officer, and thus, we shall not consider those facts for purposes of the instant motion.

other similarly situated Caucasian officers were not subjected to this type of racial harassment.  *Id.* ¶ 12.  Buntin testified that she confronted Officer Faulk once about her use of the term "license never received."  Buntin Dep. at 176.  However, she never made her complaints known to anyone other than Officer Faulk until the February 2^(nd) meeting, when she was informed that she would have to undergo remedial training.  During the meeting, Buntin asked to speak with Sergeants Jackson and Teagardin and Lieutenant Cleek alone, outside the presence of Officer Faulk.  At that meeting, Buntin complained that Officer Faulk was "not a good FTO" for her.  Def.'s Ex. N.  She also complained that Officer Faulk's "issues" with her were not legitimately based on how well she performed her job and that Officer Fault expected her "to do things exactly the way that she would do them as opposed to taking into account that we may have different styles."  *Id.*  Buntin testified that after she informed the other officers of her complaints regarding Officer Faulk, they "just all yelled at [her]" and told her that she had an unrealistic view of herself.  Buntin Dep. at 179.  Shortly before Buntin's employment was terminated, she filed a charge with the Equal Employment Opportunity Commission alleging race and sex discrimination and retaliation.

## Legal Analysis

### I.      Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)));  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc.*

*v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases because intent and credibility are such critical issues and direct evidence is rarely available. *Seener v. Northcent. Tech. Coll.*, 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made it clear that employment discrimination cases are not governed by a separate set of rules and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

## II.     Plaintiff's Claims

Although her complaint is a bit convoluted, Buntin appears to assert three claims:

(1) that she was subject to race and/or gender discrimination; (2) that she was subject to a

hostile work environment; and (3) that she was retaliated against for complaining about

that unlawful discrimination.  We address each of these claims below.

## A.     Discriminatory Assignment to Remedial Training, Termination

Buntin claims that she was assigned to remedial training and subsequently fired

because Faulk discriminated against her by allowing "her superiors to rate her

performance as substandard without just cause and subsequently terminat[ing] her based

on false and or inaccurate ratings from Faulk, while similarly situated Caucasian officers

were not treated this way."  Compl. ¶ 38.

Under Title VII, it is unlawful for an employer to "to fail or refuse to hire or to

discharge any individual, or otherwise to discriminate against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  A

plaintiff may prove discrimination under Title VII either with direct evidence of

discrimination or indirectly through the burden-shifting analysis established in

*McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  *Scaife v. Cook Cnty.*, 446 F.3d 735,

739 (7th Cir. 2006).  Having no direct or circumstantial evidence of intentional

discrimination, Buntin appears to advance her claim under the indirect method of proof.

Under the indirect method, a plaintiff must begin by establishing a *prima facie*

10

case of discrimination. If such can be established, the burden shifts to the defendant to articulate a nondiscriminatory reason for the actions taken against the plaintiff. If the defendant can offer a legitimate, nondiscriminatory reason for the employment decision, the burden reverts to the plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pretextual. *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 641 (7th Cir. 2005). The traditional *prima facie* case requires a showing by the plaintiff: (1) that she was part of a class of persons protected by Title VII; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated individuals outside her protected class were treated more favorably. *See Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 830 (7th Cir. 2007). For the reasons delineated below, we conclude that Buntin cannot establish a *prima facie* case because she clearly was not meeting her employer's legitimate job expectations.

In order to advance to the "Plain Clothes Phase" of training, a probationary officer must "earn satisfactory scores in all critical areas for at least a week prior." Def.'s Ex. D at 23. Buntin testified that during her field training she did not experience any discrimination in terms of grading from any of the alternate FTOs—Poe, King, or Jones. Buntin Dep. 62:12-25; 117:12-13, 25; 125:6-8; 128:11-15. It is true that Buntin's alternate training officers, as compared to Officer Faulk, did tend to give Buntin marginally higher grades. Def.'s Ex. I. However, Officer Faulk's somewhat lower evaluations were inconsequential. The record indicates that even with the somewhat

higher grades, under no alternate training officer did Buntin earn above a three in all critical areas during a one-week period. *See id.* Thus, her scores under Officers Poe, King, and Jones, whom the plaintiff admits did not discriminate against her, did not qualify Buntin to proceed to the "Plain Clothes Phase." Instead, Buntin would still have been deemed NRT under the Defendant's policy and relegated to remedial training.

Buntin continued to receive less than "acceptable" scores from alternate training officers even during her short stint of remedial training. *See* Def.'s Ex. I (02/05/2009-02/07/2009). Alternate FTO Peace, whom plaintiff admits graded her fairly, Buntin Dep. at 62:19-25, evaluated one of Buntin's three remedial training days and assigned her scores of either two or three in seven critical areas. *See* Def.'s Ex. I (02/07/2009). Thus, Buntin continued to fail to meet her employer's expectations during remedial training.

Because Buntin cannot establish that she was meeting Defendant's legitimate expectations of her, she is unable to make out a *prima facie* case for race and/or gender discrimination, and her claim must fail. *Celotex*, 477 U.S. at 323.

## B.     Hostile Work Environment

Buntin is African-American. She contends that the City subjected her to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; *id.* 42 U.S.C. § 1981, alleging that her FTO used racial slurs in her presence and communicated similarly offensive remarks to other officers via text messaging. Pl.'s Br. at 8. Specifically, as noted above, Buntin alleged that Officer Faulk referred to Hispanic individuals as "license never received" and to African-Americans as

"license suspended prior."  The City denies that Faulk made any such alleged slurs or discriminatory statements and further contends that, even assuming *arguendo* Faulk had made the alleged racial slurs, they were insufficiently severe or pervasive to alter the conditions of Buntin's employment in a significant way.  Def.'s Br. at 21.

In *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986), the Supreme Court clarified that the "terms, conditions, or privileges of employment" language in Title VII encompasses *environmental* conditions of employment and that the scope of the prohibition "is not limited to 'economic' or 'tangible' discrimination." *Id.* at 64.  Thus, Title VII prohibits employers from "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 701 (7th Cir. 2001).  In order to rise to the level of a hostile work environment that is violative of Title VII, a plaintiff must show: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005).

Thus, in order to survive summary judgment on a hostile work environment claim, a plaintiff must present evidence that would establish that the allegedly hostile conduct was so severe or pervasive as to create an abusive working environment in violation of Title VII. *Russell v. Bd. of Trs. of Univ. of Chi.*, 243 F.3d 336, 342-43 (7th Cir. 2001).  In order to determine whether a working environment is hostile in this sense, courts may

consider factors including "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 463 (7th Cir. 2002) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)). Conduct that is unpleasant, but is not severe or pervasive, will not constitute a hostile work environment prohibited by Title VII. *See Saxton v. Am. Tel. & Telegraph Co.*, 10 F.3d 526, 533 (7th Cir. 1993).

Here, we conclude that a reasonable jury could not conclude that Officer Faulk's alleged statements (which, for purposes of summary judgment, we assume that she made) or text messages were sufficiently severe or pervasive to support a hostile work environment claim, as more fully explained below.

### 1. Oral Statements

Buntin relies heavily on her allegation that Faulk made statements in her presence describing African-Americans as "licensed suspended prior" and Hispanics as "license never received." Pl.'s Br. at 8. Buntin testified that Faulk made these kinds of remarks "constantly" and "routinely." Buntin Decl. at 1. Buntin provides no further evidence regarding the frequency with which Faulk allegedly made such statements.[4] "Constantly"

---

[4] In her response brief and surreply, Plaintiff alleges that Faulk made these remarks "daily." However, these allegations, made in argument, are uncited and otherwise unsupported by the record. They are therefore not entitled to consideration for purposes of this motion. *Albiero*, 246 F.3d at 933 (holding that a plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment).

and "routinely" are intrinsically indefinite words that rely on context in a way that more concrete temporal terms like "hourly," "daily," or "monthly" do not. With no further evidence regarding the regularity with which Officer Faulk made these statements, we cannot view the few comments detailed in the briefs as pervasive. *See Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005) (declining to find statements pervasive where plaintiff testified that discriminatory remarks were made on a "regular basis" but provided no additional detail as to what "regular" meant).

Having concluded that the comments were not pervasive, we now address whether they were "severe." Although certainly rude and inappropriate, we find such remarks not so severe as to have changed the conditions of Buntin's employment. The statements at issue are a far cry from unambiguously racial epithets such as "nigger" or "haughty Jew" that "fall on the more 'severe' end of the spectrum." *Ezell*, 400 F.3d at 1048; *Cerros v. Steel Tech., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002). Even the use of those more severe epithets does not necessarily constitute "severe" conduct for purposes of a hostile work environment. *See, e.g.*, *Faragher*, 524 U.S. at 787 (holding that "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not sufficiently alter terms and conditions of employment to violate Title VII) (quoting *Rogers v. E.E.O.C.*, 454 F.2d 234, 238 (5th Cir. 1972)); *Pierce v. Ill. Dep't of Human Res.*, No. 07-1480, 2009 U.S. App. LEXIS 23481, at *31-32 (7th Cir. Oct. 26, 2009) (finding that flashing a Ku Klux Klan sign toward African-American plaintiff and calling him a "nigger" was not conduct "severe or pervasive" enough to create a hostile work

environment).  While reflective of ignorant stereotypes about African-Americans and Hispanics, these comments, which we have assumed to be made to Buntin, are simply not the type to render a workplace unworkable.

## 2. Text Messages

Buntin further contends that Officer Faulk's use of similar derogatory phrases in her communications with other officers via text messages contributed to the creation of a hostile work environment.  The plaintiff does not assert that she was made aware of the content of the text messages during the relevant time period, *i.e.*, the time she was employed by IMPD, and Defendant challenges the admissibility of the text messages.  Again, assuming both of these issues could be resolved in favor of the plaintiff, the derogatory text messages exchanged by Faulk and other officers—whether considered alone or in tandem with the oral statements discussed above—were not "severe or pervasive."

The text messages substantively track the statements addressed above, *e.g.*, "Juan no license," and thus are likewise insufficiently severe to give rise to a hostile work environment.  Additionally, Buntin was exposed only *indirectly*,[5] if at all, to the content of the text messages prior to her termination.[6]  Thus, not only are the messages substantively fairly innocuous, but the secondhand means by which she perceived them

---

[5]Faulk exchanged the text messages with other police officers, not with Buntin herself.

[6]If Buntin was never exposed to the content of the text messages prior to her termination, she necessarily could not have perceived the content as contributing to a hostile work environment.

makes them "less confrontational" and "less wounding" in context of a hostile work environment analysis. *See Yuknis v. First Student, Inc.*, 481 F.3d 552, 555-56 (7th Cir. 2007). The remainder of the derogatory messages Buntin identifies, *e.g.*, a message in which Faulk refers to Buntin as bipolar, lack any racial or gender nexus or connotation at all. Finally, Buntin has provided evidence of only six racially insensitive text messages over a five-month period, which can hardly be construed as "pervasive."

Title VII is not a "general civility code," and it is not intended to remedy complaints attaching "the ordinary tribulations of the workplace, such as sporadic use of abusive language." *Faragher*, 524 U.S. at 788. "[T]he sporadic use of abusive language, gender-related jokes, and occasional teasing are fairly commonplace in some employment settings and 'do not amount to actionable harassment.'" *Savino v. C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir. 1999) (quoting *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1159 (8th Cir. 1999)). Offhanded comments and isolated incidents, unless extremely serious, are not sufficient to sustain a hostile work environment claim. *Faragher*, 524 U.S. at 788.

The oral statements and text messages, considered both individually and in light of each other, *Vance v. Ball State Univ.*, 646 F.3d 461, 471 (7th Cir. 2011), simply do not possess the requisite frequency or severity to support a hostile work environment claim. *Cf. Cerros*, 288 F.3d at 1046-47 (reversing summary judgment for defendant on hostile work environment claim where plaintiff was subjected to direct and highly offensive racial epithets by both coworkers and supervisors, where coworkers openly advocated the

Ku Klux Klan and "White Power," and where there was racially offensive graffiti on the bathroom walls).

## C. Retaliation

Buntin also claims that she was graded lower during remedial training and ultimately terminated in retaliation for raising concerns about the racially charged atmosphere fostered by Faulk and for filing an EEOC claim. Under Title VII, it is unlawful "for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). A plaintiff has two methods of proof available to her to demonstrate retaliation. A plaintiff may prove retaliation either through the direct method of proof or the indirect method, also called the "burden-shifting" method. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006); *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005). It is unclear whether Plaintiff seeks to prove her retaliation claim solely under the direct method, or, in the alternative, under the indirect method. Thus, we address the merits of her claim under both frameworks.

### 1. Direct Method

To proceed under the direct method, a plaintiff must show through either direct or circumstantial evidence that (1) she engaged in statutorily protected activity; (2) she suffered an adverse action taken by the employer; and (3) there was a causal connection between the two. *Egan v. Freedom Bank*, 659 F.3d 639, 642 (7th Cir. 2011). The causal nexus referenced by the third element may be shown through direct evidence or through

18

"a 'convincing mosaic' of circumstantial evidence" that would permit the same inference without the employer's admission. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). If the plaintiff's evidence of retaliatory animus is contradicted, the case must be tried, unless the defendant presents unrebutted evidence that it would have taken the adverse employment action against the plaintiff anyway, in which event the defendant's retaliatory motive, even if unchallenged, was not a but-for cause of the plaintiff's harm. *Egan*, 659 F.3d at 642.

### a. Retaliation for Lodging Complaint About Officer Faulk

Buntin claims that she was graded lower during remedial training for raising concerns about the allegedly racially charged atmosphere fostered by Officer Faulk. Even assuming that (1) grading someone lower on an evaluation can constitute an adverse action and (2) FTO Peace did in fact grade Buntin "lower,"[7] causation is lacking. As noted above in Section II.A, Buntin has conceded that FTO Peace graded her fairly.

### b. Retaliation for Filing of EEOC Complaint

Buntin claims that she was terminated as a result of her complaining about Faulk and filing an EEOC claim. Here, again, evidence of causation is lacking. Plaintiff's conclusory statement that "[t]here is a causal relationship between [Buntin's] complaints against Faulk, her filing of an EEOC charge and her termination" is unavailing. *Adusumilli v. Ill. Inst. of Tech.*, No. 97 C 8507, 1998 U.S. Dist. LEXIS 14413, at *14

---

[7] It is unclear whether FTO Peace had ever formally evaluated Buntin prior to remedial training.

(N.D. Ill. Sept. 9, 1998) (noting that "conclusory assertions do not satisfy" the requirement that a plaintiff show a causal connection between the allegedly adverse action and the protected activity). Moreover, mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue. *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Without offering more, Buntin's claim fails.

### 2. Indirect Method

Under the indirect method, a plaintiff must show the first two elements required by the direct method, but instead of proving a direct causal link, the plaintiff must also show that she was performing her job satisfactorily and that she was treated less favorably than a similarly situated employee who did not complain of discrimination. *Leonard v. E. Ill. Univ.*, 606 F.3d 428, 431 (7th Cir. 2010). Our previous conclusion (as outlined in Section II.A) that Buntin was not meeting her employer's legitimate job expectations forecloses a claim under this framework.

## III. Conclusion

For the foregoing reasons, we GRANT summary judgment in favor of the City of Indianapolis. Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date: _____
    12/07/2011

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Stacy Lynn Cook
BARNES & THORNBURG LLP
scook@btlaw.com

Gregory P. Gadson
LEE COSSELL KUEHN & LOVE LLP
ggadson@nleelaw.com

Jennifer Lynn Haley
CITY OF INDIANAPOLIS, CORPORATION COUNSEL
jhaley@indy.gov

Cherry  Malichi
LEE COSSELL KUEHN CROWLEY & TURNER LLP
cmalichi@nleelaw.com

Mark John Pizur
CITY OF INDIANAPOLIS, CORPORATION COUNSEL
mark.pizur@indy.gov